## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## BRUNSWICK DIVISION

| | |
|---|---|
| JOHN POWELL and BRIAN SCOTT,<br><br>Plaintiffs,<br><br>v.<br><br>EMMETT NEAL JUMP; JACQUELYN LEE JOHNSON; JAMES C. PROCTOR; STEPHEN D. JESSUP; JORDAN DANIEL LOWE, JR.; MICHAEL W. LAWSON; WILLIAM V. DARAS; LIBERTY A. STEWART a/k/a LIBERTY A. GENDRON; JOHN DUSTIN SIMPSON; ELZAVER DUSTIN DAVIS; JOSEPH MULHOLLAND; BANKS THOMAS SMITH; and MARK RANDALL,<br><br>Defendants. | CIVIL ACTION FILE NO.:<br><br>_____<br><br>COMPLAINT AND DEMAND FOR JURY TRIAL |

## COMPLAINT

NOW COME Plaintiffs JOHN POWELL and BRIAN SCOTT, by their undersigned counsels, and complain against EMMETT "NEAL" JUMP, JACQUELYN LEE JOHNSON, JAMES C. PROCTOR, STEPHEN D. JESSUP, JORDAN DANIEL LOWE, JR., MICHAEL W. LAWSON, WILLIAM V. DARAS, LIBERTY A. STEWART a/k/a LIBERTY A. GENDRON, JOHN DUSTIN SIMPSON, ELZAVER DUSTIN DAVIS, JOSEPH MULHOLLAND, BANKS THOMAS SMITH, and MARK RANDALL, as follows:

## PRELIMINARY STATEMENT

1. This is a civil rights action brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 to address deprivations under color of state law of the Plaintiffs' rights as secured by the Constitution of the United States and the laws of Georgia.

2.     The claims arise from a series of baseless indictments brought against the Plaintiffs generated by prosecutors suffering from conflicts of interest for, *inter alia*, purported "oath of office" violations alleging violations of *Brady v. Maryland*, 373 U.S. 83 (1963), for the failure to conduct investigations of other police officers.

3.     The indictments were the culmination of a deep-seated conspiracy by high-profile law enforcement officials, prosecutors, and others to eliminate the Glynn County Police Department, which Plaintiff POWELL headed, and Plaintiff SCOTT previously served in a command role, and to permanently transfer control over county-wide law enforcement to the Glynn County Sheriff's Office.

4.     On April 30, 2024, the Georgia Supreme Court unanimously held that the indictment counts alleging "oath of office" violations by the Plaintiffs were baseless and were "inconsistent with the criminal statutes as pleaded and negate the manner in which Powell and Scott purportedly violated the terms of their oaths of office" in that "the indictment alleges that Powell and Scott committed these crimes in a specific way.  If Powell and Scott admit to that, they are still innocent of the alleged crimes because it is legally impossible to commit the crimes in the way the State alleged in the indictment." *Powell v. State*, 318 Ga. 875, 882 (2024).  As such, the Court held that the indictment "violates federal constitutional due process." *Id.* at 875. Accordingly, the Georgia Supreme Court reversed the trial court's denial of the Plaintiffs' demurrers to the indictment. *Id.* at 883.

5.     On June 25, 2024, the State *nolle prossed* the remaining charges against the Plaintiffs, ending four years of malicious prosecution.

## **JURISDICTION AND VENUE**

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3).

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2).  A substantial part of the events or omissions giving rise to the claims occurred in the Southern District of Georgia.

**PARTIES**

8.      Plaintiff JOHN POWELL ("Powell") is a citizen of the United States who resides in the State of Georgia.

9.      Plaintiff BRIAN SCOTT ("Scott") is a citizen of the United States who resides in the State of Georgia.

10.      At all times relevant, Defendant EMMETT NEAL JUMP was the Sheriff of Glynn County, Georgia, was acting within the scope of his employment, and was acting under color of state law. Upon information and belief, EMMETT NEAL JUMP may be served at 102 Kingfisher Road, Brunswick, Georgia, 31523.

11.      At all times relevant, Defendant JACQUELYN LEE JOHNSON was the District Attorney for the Brunswick Judicial Circuit, was acting within the scope of her employment, and was acting under color of state law. Upon information and belief, JACQUELYN LEE JOHNSON may be served at FNB South, 423 W. 12th Street, Alma, Georgia 31510.

12.      At all times relevant, Defendant JAMES C. PROCTOR was the Sheriff of Camden County, Georgia, was acting within the scope of his employment, and was acting under color of state law. Upon information and belief, JAMES C. PROCTOR may be served at 100 Camden Avenue, Woodbine, Georgia 31569.

13.      At all times relevant, Defendant STEPHEN D. JESSUP was the Sheriff of McIntosh County, Georgia, was acting within the scope of his employment, and was acting under color of state law. Upon information and belief, STEPHEN D. JESSUP may be served at

14656 GA Hwy 99, Darien, Georgia 31305.

14.     At all times relevant, Defendant JORDAN DANIEL LOWE, JR. was a Colonel with the McIntosh County Sheriff's Office, was acting within the scope of his employment, and was acting under color of state law. Upon information and belief, JORDAN DANIEL LOWE, JR. may be served at 147 Glyndale Circle, Brunswick, Georgia 31520.

15.     At all times relevant, Defendant MICHAEL W. LAWSON was a Deputy with the Glynn County Sheriff's Office, was acting within the scope of his employment, and was acting under color of state law. Upon information and belief, MICHAEL W. LAWSON may be served at 1049 Horseshoe Cove Road, Waverly, Georgia 31565.

16.     At all times relevant, Defendant WILLIAM V. DARAS worked as the Chief Investigator for the Brunswick Judicial Circuit District Attorney's Office and subsequently worked as a Deputy with the Glynn County Sheriff's Office, was acting within the scope of his employment, and was acting under color of state law. Upon information and belief, WILLIAM V. DARAS may be served at 1042 Baywood Avenue SE, Darien, Georgia 31305.

17.     At all times relevant, Defendant LIBERTY A. STEWART a/k/a LIBERTY A. GENDRON was an Assistant District Attorney for the Brunswick Judicial Circuit District Attorney's Office, was acting within the scope of her employment, and was acting under color of state law. Upon information and belief, LIBERTY A. STEWART a/k/a LIBERTY A. GENDRON may be served at 180 Lovett Lane, Brunswick, Georgia 31523.

18.     At all times relevant, Defendant JOHN DUSTIN SIMPSON was a Police Officer with the Glynn County Police Department, was acting within the scope of his employment, and was acting under color of state law. Upon information and belief, JOHN DUSTIN SIMPSON may be served at 148 Plantation Circle, Waynesville, Georgia 31566.

19.     At all times relevant, Defendant ELZAVER DUSTIN DAVIS was a Police Officer with the Glynn County Police Department, was acting within the scope of his employment, and was acting under color of state law. Upon information and belief, ELZAVER DUSTIN DAVIS may be served at 139 Deborah Lane, Brunswick, Georgia 31525.

20.     At all times relevant, Defendant JOSEPH MULHOLLAND was appointed as a Special Prosecutor for the Brunswick Judicial Circuit while serving as the District Attorney for the South Georgia Judicial Circuit, was acting within the scope of his employment, and was acting under color of state law. Upon information and belief, JOSEPH MULHOLLAND may be served at South Georgia District Attorney's Office, 114 South Broad Street, Bainbridge, Georgia 39817.

21.     At all times relevant, Defendant BANKS THOMAS SMITH was an Assistant District Attorney for the South Georgia Judicial Circuit, was acting within the scope of his employment, and was acting under color of state law. Upon information and belief, BANKS THOMAS SMITH may be served at South Georgia District Attorney's Office, 114 South Broad Street, Bainbridge, Georgia 39817.

22.     At all times relevant, Defendant MARK RANDALL was a news reporter for the *DeSoto Times-Tribune*. Upon information and belief, MARK RANDALL may be served at 2342 HWY 51 N., Nesbit, MS 38651

## STATEMENT OF FACTS

23.     In June 2010, in a case of alleged police misconduct following a police chase pursuit after officers stopped the vehicle, an unarmed female, Caroline Small, was shot and killed by Glynn County Police Department (hereinafter "GCPD") Officers Robert Cory Sasser

(hereinafter "Sasser") and Todd Simpson.

24. In August 2010, due to a vacancy, Jacquelyn "Jackie" Lee Johnson (hereinafter "Johnson") was appointed as the District Attorney for the Brunswick Judicial Circuit (hereinafter "DA").

25. Prior to Johnson's appointment as DA, a longtime veteran prosecutor serving as the Interim DA, David Perry, was preparing to present criminal indictments on Sasser and Todd Simpson to a grand jury (hereinafter "GJ") for multiple violations of Georgia law, including Felony Murder.

26. Despite independent findings by the Georgia Bureau of Investigation (hereinafter "GBI") of GCPD officer wrongdoing, supported by the former Interim-DA and several assistant district attorneys (hereinafter "ADA") in the office, including ADA Keith Higgins and ADA David Peterson, the newly appointed DA, Johnson, instead only took an informational presentment to the GJ for review, but failed to seek criminal indictments against either GCPD officer.

27. DA Johnson eventually terminated the employment of several ADAs who disagreed with her handling of the Sasser/Todd Simpson case.

28. The actions of Johnson in the Small case prompted the Georgia Legislature to change the GJ rules for law enforcement personnel and the GBI to amend their policy in response to local agencies.

29. Emmett Neal Jump (hereinafter "Jump") was first elected as Sheriff of Glynn County in 2012 and took office on January 1, 2013.

30. Unlike many Georgia counties, where the county sheriff is in charge of all law enforcement activities, for the past one hundred and seven years the Glynn County Sheriff's

6

Office (hereinafter "GCSO") had only been tasked with providing court security, process service and running its county jail.

31. The Glynn County Police Department was created in 1919 by the governing body based on corruption by previous Glynn County sheriffs in an effort to prevent disreputable activity.

32. From the onset of his election bid for sheriff, Jump publicized in contemporaneous press accounts that his office would be expanding its enforcement activities and assisting the GCPD with its duties.

33. Jump openly announced his desire to completely disband the GCPD, so he could lead all Glynn County law enforcement responsibilities, including drug enforcement.

34. In Glynn County, grand juries serve for a six-month term of court.

35. When each new GJ is impaneled, the DA runs the GJ criminal and civil process.

36. A GJ does not act independently from its DA's office.

37. Johnson testified it was her job as DA to be the legal advisor to the GJ in both criminal and civil matters.

38. After Jump became the Sheriff of Glynn County, making public his desire for consolidation of the GCPD into the GCSO, a 2013 GJ, led by DA Johnson, decided it wanted to "study" consolidation of the GCSO and GCPD into one entity.

39. DA Johnson testified she facilitated said 2013 GJ in obtaining testimony from various witnesses, including Sheriff Neal Jump, in support of consolidation.

40. In 2016, a completely different impaneled GJ, similarly counseled by Johnson, also voted to review consolidation of the GCSO and GCPD.

41. The DA testified she also assisted said 2016 GJ through the process of securing

witnesses/financial documents, so it could decide whether it wanted to retain the GCPD.

42.    Johnson later testified she had never taken a position either way on consolidation and claimed this 2016 GJ consolidation review was "organic" from the citizens.

43.    The DA-led 2016 GJ came back with presentments in support of Sheriff Jump's attempted consolidation, finding that the issue needed to be placed on a 2020 election ballot referendum.

44.    In 2017, due to on-going, incessant problems with political cronyism at the GCPD, including a lack of proper discipline and training of its officers, the Glynn County Board of Commissioners sought a police chief not steeped in Glynn County nepotism/patronage in order to correct repetitive internal problems.

45.    In 2017, the Glynn County Board of Commissioners and County Manager commissioned an independent operational and management study by the International Associations of Chiefs of Police (IACP) to conduct a review of operations at the GCPD.

46.    Shortly after the commissioning of this study, the then police chief, Matt Doering, announced his retirement.

47.    In September 2017, John Powell (hereinafter "Powell"), a Glynn County outsider, whose police career had been centered outside of Georgia, was hired as the interim GCPD police chief.

48.    Due to that development, in October 2017, Brian Scott (hereinafter "Scott") returned to the GCPD to assist Powell with the many problems plaguing the department.

49.    Scott had recently left his GCPD position in March 2017, due to issues involving cronyism and special treatment, which he had encountered while working there.

50.    In January 2018, Powell was appointed as the police chief for Glynn County, GA.

51.     Powell quickly named Scott as his Chief of Staff (hereinafter "COS") with numerous responsibilities, including conducting internal affairs (hereinafter "IA") investigations at the direction of the chief of police.

52.     Powell immediately began dealing with a multitude of problems within the department, issues that were steeped in a culture of corruption that predated Powell's arrival by decades.

53.     Two GCPD employees, Captains Thomas "Tommy" Tindale and Wilton "Kenny" Ellis, retired from their positions with the department before their employment was terminated.

54.     Former GCPD Captain Ellis went on to work for Jump as a deputy at GCSO.

55.     Former GCPD Captain Tindale's wife, Marissa Tindale, was also a captain at the GCPD.

56.     The Glynn-Brunswick Narcotics Enforcement Team (hereinafter "GBNET") was a joint narcotics unit comprised of investigators and supervisors employed by both the Brunswick Police Department (hereinafter "BPD") under Chief Kevin Jones (hereinafter "Jones") and GCPD Chief Powell.

57.     The overall management of GBNET was the dual responsibility of both Jones and Powell, which was memorialized by a long-standing memorandum of understanding between the City of Brunswick, GA and Glynn County, GA pre-dating Powell's appointment to the Chief's position.

58.     Near the beginning of 2018, GCPD's Captain Marissa Tindale took over command of GBNET and provided a written assessment of GBNET operations to Powell, noting she had minimal concerns about the performance of GBNET investigators.

59.     Upset about her husband's departure from the GCPD and the restructuring within

the department (in accordance with guidance from operational and management study by the International Associations of Chiefs of Police), she resigned her position as the GBNET commander at the end of 2018.

60.    The former GBNET Captain, Marissa Tindale, then went to work for Johnson at the DA's office.

61.    After Marissa Tindale's departure, GCPD Captain Thomas Jump (hereinafter "Captain Jump") began commanding the GBNET unit and found substantial deficiencies with reporting and documentation amongst its investigators.

62.    Although Marissa Tindale was in charge of commanding GBNET during 2018, Johnson never accused Tindale of any wrongdoing in actions taken by GBNET investigators under her direct supervisory control.

63.    Based on Marissa Tindale's reported assessment to Powell upon assuming command of GBNET, Marissa Tindale intentionally misled Powell as to problems within the unit.

64.    In February 2018, within a month of Powell's appointment as chief, a narcotics investigation led by GBNET was involved in an on-going case where members of GBNET were continuing surveillance of a drug buy across state lines, and through Camden County, GA.

65.    Before attempting a traffic stop on the vehicle containing the alleged drugs, GBNET waited for that vehicle to enter back into GBNET's jurisdiction in Glynn County, GA.

66.    When GBNET officers attempted the traffic stop, with the assistance of both GCPD and BPD officers, GCSO deputies, as well as a Georgia State Patrol (hereinafter "GSP") trooper, the driver, Katelyn Jones, instead fled, resulting in a police chase that ended in a crash that led to a fatality, several days later, of the vehicle's second occupant.

67. GSP, which conducted the PIT maneuver, conducted the crash investigation, finding that the GSP trooper who used the PIT maneuver was justified.

68. Based on those facts, Johnson criminally charged the driver, Katelyn Jones.

69. In February 2018, Camden County Sheriff James "Jim" Proctor (hereinafter "Proctor") did not raise any concerns about GBNET's jurisdiction, while it conducted surveillance through Camden County, with BPD Chief Jones or GCPD Chief Powell.

70. The lead GBNET case agent for the investigation which led to the police chase of Katelyn Jones in February 2018 was BPD Investigator Dallas Harper (hereinafter "Harper").

71. The Katelyn Jones incident was a BPD matter, as GCPD's Powell would have had no ability to conduct an IA investigation on BPD's Harper.

72. Six months later, Johnson and Proctor resurrected this GBNET jurisdictional claim in order to selectively target and indict Powell, alleging Powell had refused to properly discipline the GBNET officers involved in the incident.

73. Johnson never accused BPD Chief Jones of failing to discipline GBNET's Harper for his lead role in the Katelyn Jones incident.

74. Proctor had previously worked for Jones as an officer at BPD prior to being elected as Sheriff of Camden County.

75. By May 9, 2018, GCSO Deputy Michael "Mike" Lawson (hereinafter "Lawson"), stated he had been sent a solo photo of a GBNET Investigator John "Dustin" Simpson (hereinafter "Simpson") by a confidential informant (hereinafter "CI") who told him through family and friends that Simpson was associating with Brian Highsmith, a known felon.

76. While Lawson stated he informed his boss, Jump, about his CI's claim, he admitted that neither he nor Jump alerted Simpson's GCPD superiors, Powell, or Scott about

this supposedly damaging intel about one of their GCPD officers.

77. Lawson later testified that since he did not want to ruin somebody's life, he simply waited a while with the information.

78. Around May 14, 2018, GCPD's Cory Sasser, the very same GCPD officer that Johnson had refused to bring a criminal indictment against in the 2010 shooting death of the unarmed Caroline Small, committed domestic violence on his estranged wife, Katie Sasser.

79. The responding officers to the scene captured Sasser's actions on body camera footage.

80. A concerted effort to protect Sasser ensued within the GCPD command staff, causing Powell, its new police chief, to open an internal and criminal investigation.

81. The IA investigation led to disciplinary action being taken against GCPD personnel involved in the case.

82. At the direction of Powell, Scott conducted the criminal investigation, which resulted in Sasser being charged and arrested for offenses under the Family Violence Act.

83. Powell and Scott's unbiased administration of equal enforcement of the law against Sasser upset a host of people in Johnson's DA's office, as well as Jump, several judges, court clerks, former County Commissioner Wayne Hutcheson, and the "old-guard" GCPD command staff.

84. Sasser was very connected, both personally and politically, in the Glynn County, GA community.

85. A later GBI review of Sasser's phone records verified that many of those same individuals were secretly aiding Sasser behind the scenes, including constant communication via phone and text messages with DA and Magistrate Court staff, judges, Jump, and employees

within the GCPD.

86.    On May 15, 2018, Powell and Scott sought to keep Sasser in jail for a cooling-off period.

87.    Powell and Scott's attempt was directly countered by Jump, who abrogated normal Glynn County court procedures, as it was not a regular day for bond hearings, and had Chief Magistrate Judge Alex Atwood (hereinafter "Atwood") meet with Sasser at the county jail after-hours to facilitate Sasser's first appearance process/bond and his immediate release from custody.

88.    Alarmed at Jump's open interference with normal bond procedures showing special treatment for Sasser, Powell was vocal with Glynn County Commissioners expressing his concerns, particularly about Sasser potentially committing other acts of domestic violence against his estranged wife, Katie.

89.    In compliance with Glynn County Personnel Rules and Regulations, Powell immediately placed Sasser on suspension and recommended his termination.

90.    By May 17, 2018, within days of Sasser's bond release, a friend of Sasser notified 911 that Sasser was contemplating suicide.

91.    Sasser was located in a wooded area on a property owned by former Glynn County Commissioner Wayne Hutcheson.

92.    When GCSO deputies, and at least one GCPD officer, approached Sasser's vehicle, Sasser fired a gun at the deputies, starting an over nine-hour standoff.

93.    Concerned that some GCPD officers would not take appropriate action against one of their own, Powell requested the GSP render assistance.

94.    The standoff ended when Jump received a call from Atwood indicating Atwood

had negotiated Sasser's surrender.

95.    Seconds later, Sasser exited his vehicle and refused GSP commands, which resulted in Sasser being tased.

96.    When two GCPD officers approached to assist, Sasser kicked them.

97.    Jump's interference in the on-going investigation of this incident was well known by local and state officials who were on site during the standoff.

98.    As of May 18, 2018, not only had Sasser committed numerous felonies, including discharging his weapon at sheriff deputies and assaulting two GCPD officers, but his actions were an obvious bond violation in his domestic abuse case.

99.    After Sasser's surrender to law enforcement, he was not arrested or placed back in custody at the county jail.

100.    Jump deliberately prevented Sasser's arrest by having his GCSO deputies transport Sasser to a mental health treatment facility, so Sasser could voluntarily commit himself and avoid the loss of his law enforcement certification.

101.    Despite GSP documenting that it was GCSO deputies, not GCPD officers, who transported Sasser to the treatment facility, information was purposely provided to the local press to mislead the public, claiming GCPD officers protected Sasser from arrest/jail.

102.    Powell personally overheard a verbal speaker-phone conversation about Sasser between Jump and Glynn County State Court Judge Bart Altman (hereinafter "Altman"), wherein Altman stated, "Cory is a good boy, I'm not going to allow him to spend one night in jail."

103.    That call was particularly unsettling for Powell, who knew Altman had a direct conflict of interest, since Altman had previously represented Sasser as his private attorney in the

14

2010 shooting death of the unarmed Caroline Small, prior to Altman becoming a State Court Judge.

104.    On May 21, 2018, Powell and Scott participated in a meeting at the GCSO with Jump and Bureau of Alcohol, Tobacco and Firearms (hereinafter "BATF") agents concerning Sasser.

105.    The purpose of the meeting was to retrieve a federally regulated firearm that had to be seized from Sasser.

106.    At the time, Sasser was still in the mental health facility but had several active warrants for his arrest relating to the prior stand-off.

107.    Sasser was due to be released from the facility and would have to be arrested on the active warrants.

108.    Powell and Scott also preemptively discussed with Jump a requirement that Sasser be required to wear an ankle monitor and surrender his 250+ guns if/when he made bond on the new charges.

109.    Jump would not agree to help facilitate such conditions regarding Sasser.

110.    On May 24, 2018, Johnson sent a letter to the Georgia Attorney General's Office requesting an appointment of outside counsel for Sasser's court case, based on her office's conflict of interest due to its close relationship with Sasser.

111.    Johnson's conflict of interest was due to pressure Johnson was receiving regarding her handling of the Sasser matter.

112.    Despite her May 24, 2018, recusal letter, that very same day, Johnson allowed one of her ADAs, John B. Johnson, to represent the DA's office at Sasser's May 24, 2018, bond hearing.

113.    When GCPD Officer Joseph Hyer, one of the officer victims Sasser had physically assaulted in the woods, appeared in court to testify against Sasser's release on bond, the DA's office did not allow Hyer to testify.

114.    With no opposition from the DA's office, Glynn County Magistrate Judge Flay Cabiness (hereinafter "Cabiness") granted Sasser bond without any GPS monitoring, stating that Sasser's son would be responsible for Sasser's large gun collection.

115.    Despite ADA John B. Johnson handling Sasser's May 24, 2018, bond, it was later revealed ADA John B. Johnson and Sasser had a personal friendship.

116.    Notwithstanding ADA John B. Johnson's claim to GBI agents that he only had a "professional" relationship with Sasser as a GCPD officer, photos recovered on Sasser's phone, after his death, showed Sasser and ADA John B. Johnson embracing.

117.    When challenged about their relationship, as shown in the photographs, ADA John B. Johnson just laughed and said, "I have no idea!"

118.    After Sasser's second bond release, Powell again voiced his concerns to Jump, County Manager Alan Ours (hereinafter "Ours") and various elected officials renewing his fear that Sasser posed a real threat to his estranged wife and the community.

119.    All of Powell's warnings had been thwarted by the special treatment repeatedly afforded to Sasser by a small group of powerful Glynn Country insiders, i.e., Jump, Johnson, Altman, Atwood, and others.

120.    In a last-ditch effort to remedy the potential risk posed by Sasser, Powell sought federal help and contacted the Federal Bureau of Investigation (hereinafter "FBI") and BATF for assistance, in hopes of identifying potential federal charges to get Sasser back into police custody.

121.    The very next month, on June 28, 2018, Sasser hunted down and murdered his estranged wife, Katie, and her friend John Hall, Jr., in McIntosh County, GA, before taking his own life.

122.    Phone records of Sasser obtained by the GBI showed that Jump, employees of the DA's office, and Johnson herself, were aware Sasser was, in fact, in or near Glynn County.

123.    None of those parties made any effort to notify Powell, Scott, or the GCPD to seek their assistance in locating Sasser.

124.    On June 29, 2018, in an attempt to shift blame away from the DA's office for its special treatment of Sasser and onto Powell's GCPD, Johnson requested the GBI open an investigation to determine whether any GCPD members had assisted Sasser in violating his bond conditions.

125.    Shortly after the murders, with immense public scrutiny, a Glynn County Government personnel meeting was held, which included Powell, Jump, Johnson, Ours, Commissioner Mark Stambaugh, and other allies of Jump and Johnson who, oddly, were not involved in government operations.

126.    During that meeting, the visibly upset Johnson confronted Powell about social media posts related to GCPD Lieutenant David Haney's (hereinafter "Haney") girlfriend, whose Facebook posts were openly accusing Johnson and her office of providing Sasser special treatment, allowing him to commit the murders.

127.    During that exchange, Johnson repeatedly advised Powell that if Haney worked for her, she would fire him.

128.    When Powell noted that Haney had rights, since posting to social media was not a GCPD policy violation or against the law, Johnson informed the assembled group that "we all

needed to get on the same page."

129.   When Powell replied that the events were the story, Johnson became very angry and proclaimed to the attendees that she felt Powell was blaming her for what had taken place.

130.   Powell responded that if Johnson had taken Sasser's actions more seriously and Jump had not repeatedly interfered with normal court process, allowing Sasser to stay out of jail, Katie Sasser may not have been killed.

131.   After the Glynn County governmental meeting, the relationship between the DA's Office and GCPD deteriorated quickly, with the GCPD receiving little to no assistance with criminal cases moving forward, thereby forcing Powell to lean on federal sources more frequently.

132.   On August 16, 2018, GBNET arrested Glynn County resident, Andrew Tostenson, for a large amount of methamphetamines, marijuana, and prescription pills, with intent to distribute, as well as seizing two vehicles and $10,528.00 in cash.

133.   The defendant, Andrew Tostenson, was the son of Andrew Harold Tostenson, Jr., a/k/a Speedy Tostenson (hereinafter "Speedy").

134.   Speedy was reported to be a federally convicted felon, as well as a large financial campaign contributor to Jump.

135.   Since 2014, Jump had invited his campaign donor, Speedy, to attend the Georgia Narcotics Association's annual conference, a training event for Georgia narcotics officers.

136.   After Speedy's son's drug arrest, Powell received a call from Jump, who personally requested Powell release one of the Tostenson trucks along with the $10,528.00 in cash seized during the drug bust, with Jump claiming those items were owned by the father, Speedy.

18

137. When Powell advised Jump he would not be releasing the seized drug bust money or vehicle, and that the matter, like any other involving a criminal defendant, would be handled by the courts, Jump was livid.

138. By the end of Summer 2018, Johnson and Jump realized the relatively new Police Chief outsider, Powell, was not on board with their system of administering Glynn County justice based on political cronyism, preferential treatment, and favors to their financial donors.

139. It was well known that Powell's new Chief of Staff, Scott, was an honest police officer and a straight shooter, who conscientiously followed the letter of the law, not personal or political agendas.

140. In order for the Jump/Johnson system of cronyism to survive in Glynn County, both Powell and Scott had to be eliminated.

141. The Summer of 2018 was the inflection point when the powerful Brunswick Judicial Circuit District Attorney and equally formidable Sheriff of Glynn County formed a plan to rid themselves of Powell and Scott.

142. Jump would use his allied prominent county sheriffs/law enforcement employees as attack dogs to concoct selective, baseless allegations of wrongdoing against Powell and Scott.

143. Johnson would weaponize the formidable DA's office to indict Powell/Scott, thereby forever tarnishing their professional law enforcement reputations in an effort to force both men from their high-level GCPD positions.

144. By August 2018, Jump's prominent law enforcement surrogates began resurrecting old, false accusations and directing them at Powell, based on an identical theme, claiming that Powell had failed to properly discipline his officers.

145. In August 2018, Proctor, a known close ally of Jump, wrote a letter to resurrect a February 2018 GBNET incident accusing GBNET officers of illegally running a drug operation outside of their proper jurisdiction.

146. In that February 2018 incident, GBNET conducted surveillance on a party to a drug buy, observed the buy, and then followed the potential narcotics buyer's vehicle back through Camden County, before attempting a completely legal arrest in their jurisdiction in Glynn County.

147. Events where law enforcement officers are required to conduct surveillance in different jurisdictions, while conducting police investigations into ongoing crimes, are routine throughout Georgia and the United States.

148. As Proctor was fully aware, notifying a sheriff of another county when officers are simply passing through is a courtesy, not a prerequisite.

149. Despite this particular GBNET operation being run by Harper, a BPD, not GCPD, investigator assigned to GBNET, Proctor's claims were solely utilized to indict GCPD's Chief Powell, but no indictment was brought against BPD's Chief Jones.

150. Proctor, who lost his 2024 bid for re-election as Sheriff of Camden County, is currently employed by Jump at the GCSO.

151. Throughout 2019, working in tandem with Johnson, Jump used his influence with his allies, i.e., Camden County Sheriff Proctor, McIntosh County Sheriff Stephen Jessup (hereinafter "Jessup"), Jessup's Colonel Jordan "Danny" Lowe (hereinafter "Lowe"), as well as Sheriff's Deputy Lawson, to stir up conflicts, resurrect old uncorroborated rumors, outright manufacture false statements, and initiate fictional timelines regarding Powell and Scott.

152. Johnson focused her attacks on Powell and Scott by utilizing the wrongdoing of a

flawed GBNET investigator, James Cassada (hereinafter "Cassada"), as well as having the DA's office entice officers and others to lie under oath in court by exploiting her position as the DA to grant plea deals or derivative use "immunity", e.g., Simpson, Cassada and his wife Hope Cassada, and GCPD Investigator Elzaver "Dustin" Davis (hereinafter "Davis").

153. Johnson's tactic of weaponizing her DA's office with the goal of charging Powell and Scott with false and legally baseless state felony oath of office violations, was meant to destroy their careers and reputations and immediately get them removed from their high-level law enforcement roles at the GCPD.

154. Two early innocuous January 4-5, 2019, traffic stops on Lowe by random GCPD officers, on the same evening, resulted in a claim by yet another of Jump's close and prominent sheriff allies, Jessup, leading to a bizarre indictment count against Powell.

155. According to two GCPD officers, both officers observed a vehicle, which turned out to be an unmarked McIntosh Sheriff's Office truck, driven by Lowe who was not in uniform, driving erratically on Glynn County roads on a January evening/early morning.

156. In the service of public safety, two different GCPD officers made traffic stops based on a similar observation - erratic driving.

157. The police interactions with Lowe were only recorded by officer body cams, as GCPD vehicle dash cameras had been removed prior to Powell's tenure.

158. Neither stop resulted in a ticket or Lowe's arrest.

159. Without GCPD dash camera videos to show evidence of Lowe's erratic driving, Jessup realized he could re-purpose the stops to gin up false allegations against Powell and his GCPD officers.

160. Based on Jessup's call to Powell about the traffic stops, Powell personally

reviewed video footage from the officers' body cameras.

161. Based on that body camera footage review, Powell informed Jessup that both traffic stops were handled within legal precedent, by-the-book under GCPD policy, with both GCPD officers' behavior being extremely professional.

162. Despite Jessup's direct knowledge of Powell's personal review and findings in favor of the two GCPD officers, Johnson had Powell indicted based on Jessup's accusation that Powell had refused to properly initiate IA investigations into his GCPD officers or take disciplinary administrative actions for what Jessup claimed were "questionable" traffic stops.

163. Jessup also falsely asserted that GBNET was involved in the second stop, testifying in the GJ that he knew "undercover" officers were involved because unmarked cars were used and the officers involved were in plain clothes.

164. Body camera video footage showed the traffic stop and surrounding area, with marked cars and uniformed officers.

165. Lowe also testified before the GJ that he had been stopped by GBNET officers.

166. When asked by the prosecutor, Lowe stated, under oath, that he knew the officers worked "narcotics" because they were in plain clothes and driving unmarked cars.

167. Lowe's statement, under oath, was easily debunked by body camera video footage.

168. Jessup and Lowe deliberately lied to the GJ during their testimony.

169. The January 2019 accusation made by Jessup and Lowe was strikingly similar to the August 2018 accusation made by Proctor, with both Jump surrogates similarly accusing Powell of the same act - failing to properly discipline his GCPD officers.

170. Both sheriffs conspired to use their elected law enforcement titles to reinforce

22

Jump and Johnson's conspiracy objective to remove Powell from the GCPD and destroy the GCPD's reputation to force its consolidation under Jump and the GCSO.

171. The intended goal of the Jump/Johnson conspiracy, was if they could rack up enough accusations of misconduct by law enforcement allies like Jessup and Proctor, the quantity of accusations of wrongdoing, regardless of how baseless, would, to the public or a GJ, ruin Powell and Scott's reputations and credibility.

172. At the time of these accusations, Lowe's wife, Judy Lowe, was an employee of Johnson at the Brunswick Judicial Circuit District Attorney's Office.

173. Judy Lowe now works for Jump at the GCSO.

174. A review of an approximately one year-old tape, discovered on January 30, 2019, by Brunswick Police Investigator Meredith Tolley (hereinafter "Tolley") assigned to GBNET, in preparation for a narcotics trial, exposed potential unethical sexual relations and policy violations between GBNET's Cassada and a confidential informant (hereinafter "CI").

175. Tolley failed to review the interview tape prior to submitting the same into evidence in 2018.

176. If Tolley had followed established policy and procedure, the actions by Cassada would have been known in 2018, preventing additional questionable criminal cases from Cassada being made.

177. Cassada's inappropriate actions with the CI occurred in late 2017/early 2018, around the same time when Powell was officially appointed as GCPD's new police chief.

178. BPD personnel assigned to GBNET reported this information directly to one of Johnson's ADAs, Liberty Stewart a/k/a Liberty Gendron (hereinafter "Stewart").

179. Stewart took no action and advised officers to notify a BPD sergeant about the

incident, not Powell.

180. Johnson later testified under oath that "problems" in GBNET were not disclosed to her or anyone in her office.

181. On February 1, 2019, when Powell and Scott were first advised about the Cassada/CI allegations, Powell immediately informed Ours, contacted the GBI to conduct a criminal investigation, had Scott open an IA investigation, and instantly placed Cassada on leave during the investigation, the first step towards his termination.

182. On the day Cassada was supposed to meet with Scott for his IA interview, Cassada resigned.

183. The GBI investigation into Cassada's improper relations with the CI was conducted by GBI Special Agent James Feller (hereinafter "Feller").

184. Feller concluded that although Cassada's actions were serious internal GCPD policy violations and unethical, Cassada had not committed a criminal offense.

185. Neither Johnson nor Jones took any action against Tolley for her failure to follow proper procedures regarding the initial interview, which resulted in a year-long delay in exposing Cassada's improper actions.

186. Johnson publicly blamed Powell, but not Jones or Tolley, citing this failure to be solely on Powell's part to manage GBNET.

187. Tolley left BPD shortly after and went on to work for Jump at the GCSO.

188. In early February 2019, almost immediately after the Cassada/CI revelations, Johnson claimed officers were "coming to her" with additional information alleging that, "possibly", Powell was aware of Cassada's actions and had covered them up.

189. In early February 2019, directly after the Cassada/CI issue came to light, Lawson

professed to Johnson that in May 2018 he had notified Powell and Scott about an incident, mimicking both Proctor and Jessup's claims that Powell and Scott had failed to timely investigate or properly discipline a GCPD officer.

190.     Johnson later testified that in early February 2019, she was contacted by Lawson, who in 2018 was tasked on assignment at BATF.

191.     According to Johnson's testimony, Lawson told her that in May 2018, one of his informants contacted him about an alleged incident at an establishment called Blue Bar with Simpson, where, while off duty, Simpson was allegedly hanging out with a convicted felon, Brian Highsmith, while that felon had a gun.

192.     For a BATF agent, a felon carrying a gun would be a serious matter.

193.     In May 2018, despite this intel coming from Lawson's own CI, Lawson conducted no follow-up investigation to confirm if the basic facts of his CI's story were accurate.

194.     Lawson admitted in a later 2019 GBI interview that, at the time of the alleged 2018 Simpson/felon incident, he had also notified Stewart.

195.     A law enforcement officer's communication to an ADA imputes that ADA's knowledge to the DA, and in this case Lawson's communication with Stewart about Simpson imputed Stewart's knowledge to Johnson and her entire DA's office.

196.     In 2018, Stewart, who worked for Johnson at the Brunswick Judicial Circuit District Attorney's Office, did not find the Simpson/felon incident with a gun allegation to be significant.

197.     Neither Stewart nor Johnson notified anyone at the GCPD about the allegation that Simpson had a close friendship with a convicted felon.

198.    Simpson hanging out with a felon at a bar, while off duty, was not a crime.

199.    Based on Simpson's record of policy violations under GCPD's system of progressive discipline, for Simpson hanging out with a felon at a bar, Simpson would only have received a minor reprimand for a GCPD policy infraction.

200.    Despite Lawson's failure to corroborate a single fact from his CI's rendition of this alleged 2018 bar incident, Johnson contacted the GBI to conduct a criminal probe targeting not Simpson, but Powell and Scott.

201.    Feller, the agent assigned to investigate Cassada, was also assigned to conduct the GBI investigation into Lawson's 2018 bar incident claims.

202.    During his investigation, when Feller was asked to do "some things" by Johnson that he did not feel comfortable doing, Johnson promptly went over Feller's head, contacted the GBI special agent in charge in Kingsland, and had a new GBI Agent, Niklaus Antczak, assigned to the matter.

203.    Lawson was later removed from the BATF task force because of domestic violence issues and reassigned to "routine" duties at the GCSO.

204.    Because of Lawson's displeasure with that assignment and Jump's failure to follow through with a promised promotion to Lawson as a reward for assisting in the take down of GCPD, Lawson eventually left his position at the GCSO.

205.    On February 14, 2019, within two weeks of learning about Cassada's wrongdoing, Johnson wrote a letter notifying various courts and governmental departments about the Cassada/CI matter.

206.    Despite it being at the early stages of Feller's investigation and the inception of Antczak's investigation into Powell and Scott, Johnson did not wait to ascertain facts and/or

26

findings from either investigation to determine probable cause.

207. According to Johnson's sworn testimony, in early February 2019, she began her investigations into Powell.

208. Powell was tasked with running the GCPD, which included managing approximately 115 police officers.

209. To indict Powell and Scott, Johnson converted Cassada's moral failings, as well as an alleged minor GCPD policy infraction by Simpson, neither which were crimes, from 2 out of 115 GCPD officers, and proceeded to twist those incidents into selective prosecutions against the GCPD officer's superiors, Powell and Scott.

210. One day later, on February 15, 2019, Johnson, with no credible facts or probable cause related to Powell, authorized her Chief Investigator, William "Bill" Daras (hereinafter "Daras"), to open up a criminal investigation into Powell and Scott.

211. By February 15, 2019, Powell had only held his position at the GCPD for a little over one year.

212. Rather than Johnson and her DA's office simply dropping charges in a drug case involving a defendant named Gary Whittle, which involved the now disgraced Cassada and that same CI, Johnson began working in tandem with the Public Defender to publicly broadcast a set of four lengthy open court hearings that took place between February 20, 2019 through April 5, 2019.

213. Johnson utilized the *State v. Whittle* court hearings to conduct investigations into Powell and particular GCPD officers she wanted removed from their GCPD positions.

214. Prior to Johnson obtaining sworn testimony from witnesses in the case of *State v. Whittle*, which began on February 20, 2019, five (5) days earlier on February 15, 2019, Johnson

27

had already authorized Daras to open a criminal investigation into Powell and Scott.

215. During the *Whittle* hearings, regarding specific GCPD personnel, Johnson upended her office's normal protocol of, prior to court testimony, discussing potential questions GCPD officers might be asked in court so they could review documents to assist their recollection of facts.

216. During the *Whittle* hearings, not only did Johnson's DA's office fail to prep GCPD personnel, but the DA attorneys abrogated their ethical and legal responsibilities by refusing to properly represent and/or make any appropriate legal relevance objections in court during specific GCPD personnel testimony.

217. A cursory review of the four *Whittle* court proceedings indicates it was not the opposing Public Defenders' office who led the attacks against specific GCPD witnesses, but instead, it was DA Johnson's office.

218. Johnson's office, while supposedly legally representing the GCPD, conducted fact-finding investigations into particular GCPD witnesses on issues that had absolutely no bearing on Cassada and the CI's involvement in the *Whittle* drug case.

219. Johnson commandeered the four *Whittle* court hearings to blindside her GCPD enemies list, particularly Powell and Haney, whose girlfriend had openly posted on Facebook that Johnson's special treatment of Sasser resulted in the Sasser murders.

220. Johnson utilized the *Whittle* hearings to conduct investigations into Powell and GCPD personnel, while also attempting to set up "gotcha" perjury traps for future indictments.

221. Johnson converted the testimony, given under oath, of low-level GCPD officers, e.g., Simpson and Davis, by strong-arming them with threats of indictments for perjury to get them to alter prior statements and falsely testify to implicate her GCPD enemies.

28

222.    Johnson exploited her powerful role as the Brunswick Judicial Circuit District Attorney to publicly attack and smear Powell, Scott, and other specific GCPD officers for wrongdoing in open court hearings, knowing her fabricated accusations would be widely publicized throughout the media/press, a first strike in order to poison an eventual Brunswick GJ and/or court jury pool against Powell and Scott.

223.    The reason the media/press, along with a litany of the most notable citizens of Glynn County, showed up in attendance at the *Whittle* hearings, a minor drug case, was because Johnson and Jump had summoned them to court to be present for the DA's opening volley against Powell and his GCPD.

224.    Johnson's attacks in court were meant to sow citizen distrust in the GCPD and smear the overall reputation of its 115+ officers, a dual benefit for Johnson/Jump's attempted power grab in Glynn County, seeking consolidation of the GCPD into the GCSO under their full control.

225.    By February 25, 2019, Antczak had interviewed both the owner of Blue Bar, Sheryl Waters, and her daughter, Kristy Waters.

226.    Blue Bar Owner Sheryl Waters told Antczak that the Blue Bar incident, with Simpson playing pool with a man who had a gun in his back pocket, occurred in August 2018, not in May 2018.

227.    Sheryl Waters' daughter, Kristy Waters, present during the actual incident, identified the individual with the gun playing pool with Simpson at Blue Bar as a man named Ty Hutchinson, not Brian Highsmith, as claimed by Lawson's CI.

228.    Ty Hutchinson, the man Kristy Waters identified as playing pool with Simpson while possessing a gun, was not a felon.

229. By February 25, 2019, Antczak had evidence that Lawson's CI's claim, i.e., Simpson was hanging out with felon Brian Highsmith while Highsmith was carrying a gun, was factually erroneous.

230. By February 25, 2019, Antczak had evidence that Lawson's timeline version of events, wherein Lawson alleged in May 2018 he had informed Powell and Scott about the Blue Bar incident, to be chronologically impossible.

231. Lawson identified two dates to Antczak when he supposedly notified Powell and Scott about GBNET Simpson: 1) a May 21, 2018 meeting specifically held at the GCSO about removing Sasser's guns, and 2) an 11-minute May 24, 2018 follow-up phone call with Scott.

232. Scott testified the May 24, 2018 call was solely related to Sasser.

233. Lawson testified the 11-minute May 24, 2018 call was specifically about Simpson and the Blue Bar incident.

234. Lawson had no contemporaneous memos or notes to verify or memorialize either his May 21, 2018, meeting or subsequent May 24, 2018, phone call, as topics related to Simpson/Brian Highsmith.

235. Lawson latched on to two May 2018 dates when he had conversations with Powell and Scott about Sasser to claim both conversations were actually about Simpson.

236. Since the Blue Bar incident happened long after May 2018, Lawson's claim that he informed Powell and Scott about the Blue Bar incident in May 2018 was false.

237. Lawson conspired with his boss, Jump, and Johnson in a scheme to falsify and predate a timeline, to reinforce Jump/Johnson's repetitive theme that Powell and Scott had failed to timely investigate and/or properly discipline their GCPD officers.

238. Lawson, who had previously served in GBNET for a number of years prior, had

30

made known his desire to oversee narcotics investigations in Glynn County, providing a professional benefit for his participation in assisting Jump to take over the GCPD.

239. Despite Powell having no personal knowledge of a single relevant fact related to the *Whittle* drug case or Cassada's involvement, Johnson subpoenaed Powell to testify at the *Whittle* court hearing on April 3, 2019.

240. As of April 2, 2019, Johnson knew that Antczak's Blue Bar investigation findings would show Lawson's CI's story was factually erroneous and Lawson's timeline was fabricated, necessitating Antczak to make GBI findings exonerating Powell and Scott of wrongdoing.

241. With Antczak's findings, Johnson realized she would lose a tremendous weapon in her public attack on Powell at her April 3, 2019, cross-examination, i.e., using statements from a supposedly independent BATF/Glynn County Sheriff's Deputy to accuse Powell in open court of failing to properly discipline his officers, a theme central to the conspiracy.

242. With Antczak's GBI investigation still open, Johnson's ability to even legally cross-examine Powell at that April 3, 2019, hearing on this specific issue was murky, without first notifying Powell of his constitutional rights.

243. If Johnson could not raise Lawson's accusations in open court, the local press reporters she had summoned would lose their ability to then publish, sensationalize, and widely circulate Lawson's accusations smearing Powell, Scott, and the GCPD in the eyes of the public.

244. On April 2, 2019, one day prior to Powell's subpoenaed testimony, Johnson ordered Antczak to immediately close his criminal investigation.

245. Antczak's investigation was closed without making any official findings from the GBI, avoiding GBI factual findings exonerating Powell and Scott as to Lawson's claims about

31

Simpson and the Blue Bar incident.

246. On April 3, 2019, at a hearing being held to determine whether then disgraced GBNET Investigator Cassada's participation in the arrest of drug defendant, Gary Whittle, was tainted, Johnson personally cross-examined and ran her continued investigation into Powell.

247. At the *Whittle* court hearings, the role of the Public Defender was to elicit testimony to represent its client, Gary Whittle.

248. The duty of Johnson and her office was to provide sound legal representation for GCPD witnesses, including asserting appropriate legal objections to Public Defender questions.

249. Johnson's cross-examination of Powell had absolutely nothing to do with the *Whittle* drug case, Cassada or the CI, but was used to illicit extraneous facts from Powell, as a part of her current ongoing investigations into Powell and Scott.

250. Johnson's April 3, 2019 cross-examination of Powell was a precursor road map of non-crimes she would re-purpose for future indictments.

251. At that April 3, 2019 hearing, Johnson questioned Powell about Simpson voluntarily changing his statement provided to Scott during his IA investigation of Cassada, accusing Powell of the crime of "Influencing a Witness" and "Suborning Perjury".

252. Johnson questioned Powell about Lawson's Blue Bar incident allegations, accusing Powell of failing to timely discipline Simpson based on Lawson's timeline.

253. Johnson also questioned Powell about Proctor's claim, accusing Powell of failing to properly investigate GBNET personnel for illegally operating outside of their jurisdiction.

254. In addition, Johnson questioned Powell about Jessup and Lowe, accusing Powell and his GCPD officers of retaliation against Lowe.

255. Moreover, Johnson questioned Powell about GCPD Officer Kevin Yarborough

(hereinafter "Yarborough"), one of the uniformed officers involved in the police chase with Katelyn Jones, a stop made at the request of BPD's Harper related to his investigation, blaming Powell for the resulting traffic crash incident and death.

256. Furthermore, Johnson questioned Powell about Davis, who was the only GBNET investigator involved in the Cassada case, despite Powell having no personal knowledge of Davis's involvement with Cassada, accusing Powell of covering up the Cassada/CI incident.

257. On April 5, 2019, despite Lawson having no connection whatsoever to the *Whittle* drug case, GBNET, Cassada or Cassada's CI, Johnson had Lawson called as a witness in the *Whittle* court hearings.

258. On April 5, 2019, Johnson personally cross-examined Lawson in order to publicly accuse Powell and Scott of wrongdoing in open court in front of the media/press.

259. By April 5, 2019, Johnson conclusively knew from Antczak's investigation, which she both initiated and then had deliberately closed on April 2, 2019, that Lawson's CI's story was factually erroneous and the timeline fabricated.

260. Despite her prior knowledge, Johnson suborned perjury when she allowed Lawson to testify under oath at the April 5, 2019, Whittle hearing that he had informed Powell and Scott about an incident with Simpson and felon Brian Highsmith, where Highsmith had a firearm.

261. Johnson suborned perjury when she permitted Lawson to testify that GCPD Simpson flashed his credentials and said that the felon (Highsmith) having the gun was okay.

262. Johnson knew that Lawson's testimony at the April 5, 2019, *Whittle* hearing was false.

263. At that April 5, 2019, hearing, Johnson proceeded to ask Lawson questions in

violation of proper evidentiary rules, when she had Lawson corroborate alleged facts about which he had no personal knowledge regarding both Proctor's claim that GBNET personnel were working outside of Glynn County where they had no police powers and Jessup's claim that Lawson "heard" GCPD officers were harassing Lowe.

264. After the April 5, 2019, hearing the press was littered with negative stories about Powell, Scott, and the GCPD, which included outlines of witness testimony.

265. On April 6, 2019, in a telephone call between Scott and Simpson, initiated by Simpson, Simpson stated he was upset that a newspaper article that morning had claimed he had allowed convicted felon Brian Highsmith to carry a gun, and denied it ever happened.

266. When Scott told Simpson he was being cautious because he was now being accused of coercing Simpson, Simpson stated he had seen that in the paper and asked, "Is this Jackie Johnson's shit?"

267. After Blue Bar employee, Kristy Waters, read the incorrect court testimony about Highsmith in the local press, where Lawson accused Simpson of allowing a felon, Brian Highsmith, to carry a gun at their bar, Kristy Waters immediately contacted the GCPD to notify them that the individual carrying the gun in the Blue Bar incident was not a felon named Brian Highsmith, but a man named Ty Hutchinson, who was not a felon.

268. On April 9, 2019, Powell assigned Captain Jump to follow-up with the Sheryl and Kristy Waters witnesses.

269. When Captain Jump asked Sheryl Waters when the Blue Bar incident occurred with Simpson and Ty Hutchinson, she stated it was in late summer last year, around August 2018.

270. According to Blue Bar Owner Sheryl Waters, the actual Blue Bar incident had

occurred three (3) months after Lawson claimed he had discussed the very same incident with Powell and Scott.

271. Sheryl and Kristy Waters told Captain Jump that they were very surprised these false statements were being widely circulated in the news, because they had already provided this identical information to Antczak in February/March of 2019.

272. Shortly after the *Whittle* hearings, in an attempt to get Powell fired by the Glynn County Board of Commissioners, Johnson, outside of her prosecutorial duties, contacted Ours and Glynn County Attorney Aaron Mumford (hereinafter "Mumford") and directly accused Powell of committing the crime of perjury on the witness stand during his testimony in *Whittle*.

273. When Ours and Mumford confronted Powell with Johnson's accusation, Powell responded that his court testimony was completely truthful.

274. Judge Roger Lane, the Brunswick Judicial Circuit Superior Court Judge who heard the court testimony in *Whittle*, made no findings that Powell had committed perjury or made false statements during his testimony.

275. Judge Lane's May 28, 2019, order, did, however, find that impeaching information existed within the meaning of *Giglio* with respect to Simpson and Davis.

276. Judge Lane found Simpson and Davis's testimony in *Whittle*, Simpson being one of the Johnson's critical witnesses against Powell and Scott, not to be credible.

277. Simpson is currently assigned as a lieutenant with the GCPD assigned to oversee the department's Office of Professional Standards, the division which conducts internal investigations into allegations of officer misconduct.

278. In late May/early June 2019, Johnson, in a second attempt to get Powell fired, outside of her prosecutorial duties, requested a meeting with Glynn County Commissioners

Mike Browning and Bill Brunson (hereinafter "Browning and Brunson").

279. At that May/early June meeting, Johnson claimed she had obtained additional information about GCPD police misconduct, including complaints from Proctor that accused GBNET of working outside of its jurisdiction.

280. Johnson told Browning and Brunson that after a February 2018 police chase involving a drug bust, GCPD officers were seen wearing ski masks, holding what looked like machine guns.

281. Johnson told Browning and Brunson she had concerns whether Powell knew about these things.

282. Johnson claimed to Brunson and Browning that because of these GCPD issues, she had to dismiss about 18 months of cases prosecuted by her office.

283. Johnson did not dismiss 18 months of cases prosecuted by her office due to GCPD issues.

284. Browning and Brunson told Johnson they had this covered.

285. Once Johnson got Cassada to plead to two Oath of Office violations to protect his wife Hope from potential criminal charges, in a third attempt, outside of her prosecutorial duties, to get Powell fired by the Glynn County Board of Commissioners, Johnson disclosed to Ours and other commissioners that Cassada had directly implicated Powell during a proffer he provided during the plea agreement.

286. A later discovery process confirmed that at no time did Cassada's proffer ever implicate Powell in the GBNET event.

287. Cassada's statement never mentioned Powell.

288. This additional attempt by Johnson to deliver to Ours and other commissioners

36

seemingly insider information from her DA's office, which Johnson knew was false, was another attempt to get Powell fired from the GCPD.

289. All three attempts made by Johnson to get Powell fired from his lead role at the GCPD in the late Spring/Summer of 2019, were made while Johnson was acting outside of her official duties and role as prosecutor.

290. On May 16, 2019, Scott attended an opioid roundtable meeting in Savannah, GA, at the United States Attorney's Office.

291. Stewart was present at that meeting as a representative of the DA's office.

292. At that event, Scott directly asked Stewart why her boss, Johnson, was going after the GCPD.

293. At that event, Stewart told Scott, "off the record", Johnson was going after Powell because he tried to make Johnson look bad during the Sasser murders.

294. In the summer of 2019, prior to a scheduled meeting on another matter, BPD Chief Jones contacted Powell and said he wanted to speak with him ahead of the meeting on a delicate matter.

295. At that meeting, Jones told Powell that he needed to be aware that they are "trying to get you."

296. Jones, who seemed unnerved, proceeded to warn Powell that Neal (Jump) told him they had salacious photographs of the married Powell with a girlfriend and that they were going to have the photos published to destroy Powell's career - essentially a threat of blackmail.

297. Powell explained to Jones that he was a happily married man, did not have a girlfriend, and thus it was not possible there would be any damaging photos of him with a girlfriend to publish.

298. When Jones asked why Jump would make up that claim, Powell told Jones to tell Jump to send him the photos, because they do not exist.

299. After that meeting, Powell never heard of Jump's threat to send salacious photos of him with an imaginary "girlfriend" to the press.

300. On July 14, 2019, afraid of being targeted by Johnson, Simpson wrote a statement to Daras, in his role as chief investigator for the Brunswick Judicial Circuit District Attorney's Office, claiming that he had only changed a prior statement made to Scott during Scott's IA investigation into Cassada, because he feared his job was at jeopardy, suddenly claiming he was now 100% sure he had told Haney about Cassada.

301. Simpson said his testimony at the *Whittle* hearing and his July statement to Daras were truthful, but his directly contradictory earlier recorded statement to Scott was made because he felt intimidated that he could lose his job.

302. Johnson used her power to flip Simpson to outright reverse his prior recorded statement to Scott, where Simpson independently called Scott and specifically told him he was wrong concerning a previous statement provided concerning whether he had told Haney about Cassada, and had, in fact, not told Haney about Cassada.

303. With Simpson's DA-induced altered testimony and immunity, Johnson was prepping her upcoming indictments against Powell and Scott for subornation of perjury and influencing a witness, exactly the charges Johnson had previewed in her April 3, 2019, cross-examination of Powell.

304. At the end of July 2019, Scott accepted a Police Chief position in Vidalia, GA.

305. A few days after the announcement was made public, Jump called Toombs County Sheriff Alvie Kight alleging that Scott was under investigation by the GBI related to

GBNET stuff and was going to be indicted.

306. When Sheriff Kight relayed that information to Vidalia City Manager Nicholas Overstreet (hereinafter "Overstreet"), Overstreet called Scott and questioned him about the accusation.

307. Unbeknownst to Scott, Overstreet personally knew Johnson.

308. When Scott told Overstreet he had no knowledge of any investigation wherein he was the target, Overstreet called Johnson to ask her if the allegations against Scott were, in fact, true.

309. Johnson told Overstreet that Scott had done nothing wrong and had nothing to worry about, stating "people may not always like Brian, but he is always going to do what's right."

310. Johnson quipped that "at most, he is a witness."

311. Middle Judicial Circuit District Attorney Hayward Altman also reached out to Johnson, as the City of Vidalia wanted to ensure they were not hiring a police chief who was under investigation, and he was told the same thing.

312. Based on Johnson's statements, Overstreet followed through and hired Scott as Vidalia, GA's new police chief.

313. Johnson's statements to Overstreet in July 2019, show Johnson did not believe Scott had done anything wrong.

314. Johnson's mindset in the Summer of 2019 was to use her DA's role to flip Scott into a witness by having him suborn perjury and falsely accuse Powell of wrongdoing to avoid being indicted himself.

315. In the Summer of 2019, Jump, who was not a DA, was told that Scott was both

under investigation and going to be indicted related to "GBNET stuff", and Jump used said information to prevent Scott from gaining employment as the police chief for the City of Vidalia.

316. During the summer of 2019, after Johnson's numerous failed attempts to get Powell fired from the GCPD through her appeals to Glynn County Commissioners, Johnson decided the only way she was going to eliminate Powell was to use her prosecutorial power as the DA.

317. According to Daras, sometime after their testimony in *Whittle* in the Summer of 2019, the DA's office gave derivative use immunity to Davis and Simpson.

318. While Johnson claimed she was forced to close hundreds of drug cases due to Cassada's actions, the actual number of drug cases that were dropped by Johnson based on *Whittle* was shockingly small, approximately fifteen cases.

319. One of the few drug cases where Johnson dismissed charges due to the *Whittle* drug case was the case against Andrew Tostenson, son of "Speedy" Tostenson, a large campaign contributor and supporter of Jump.

320. By late Summer 2019, Johnson testified she had "asked" the GJ to conduct a civil inquiry into GBNET issues and provide her with recommendations, with the GJ, which she led, voting to grant said inquiry.

321. Johnson testified that this new 2019 GJ "felt" the public really needed to vote as to whether Glynn County should still have a county police department and granted that inquiry.

322. Regarding the consolidation issue, Johnson testified, under oath, that she had no dog in the fight, did not care if Glynn County had a police department, and had not taken a public position on the issue, but felt citizens had the right to vote on it.

323.   Johnson's 2018-2019 GJ attempt at consolidation of the GCPD into the GCSO was Johnson's third bid, 2013 GJ, 2016 GJ, and 2018-2019 GJ, to achieve her and Jump's goal to consolidate their Glynn County power by eliminating the GCPD and placing all Glynn County law enforcement powers under Jump's control.

324.   Johnson testified that at the GJ's request, she contacted Mumford and consulted with Mike Maloy (hereinafter "Maloy"), whom she knew had close connections with State Senator William Ligon, State Representative Jeff Jones and State Representative Don Hogan, because the GJ had included in its presentments about placing something on the 2020 ballot for the public to vote on.

325.   Johnson's choice to involve Maloy in the GCSO/GCPD consolidation process exposed her true motives.

326.   Maloy, known for being heavily involved in politics, including managing the political campaigns for Johnson, various judges, commissioners and other state representatives, was also a consistent public advocate for dissolving the GCPD, as well as for terminating Powell as GCPD's Police Chief.

327.   After Johnson's 2018-2019 GJ spoke with the individuals Johnson brought before it to eliminate the GCPD, the GJ issued its presentments, which her office then typed up.

328.   According to Johnson, that GJ made some pretty strong recommendations to county commissioners with respect to the GCPD and felt the public needed to be able to vote whether or not they had a police department in Glynn County, GA.

329.   Johnson's attempt for a public vote for consolidation of the GCPD into the GCSO was later accomplished under SB509, which was passed, but the referendum never made it on the ballot, as a Chatham County Judge ruled the measure to be unconstitutional.

330. By October 2019, in a meeting between Ours and Johnson, Ours later testified that Johnson told him "Dark days are ahead for the police department…".

331. Johnson made it clear to Ours that she was not happy with Powell, and felt there were moral problems going on at the GCPD.

332. Johnson told Ours that she was going to hire a special prosecutor to look at Powell and the GCPD, but that it would not take long for that special prosecutor to review her files, because she had already done all the work for them and the indictments just needed to be presented.

333. Johnson later admitted in sworn testimony that, during this time frame, in response to her accusations against Powell's leadership at the GCPD, Glynn County Commissioners told her, "That there's nothing to see here Jackie, you're just being political….".

334. After that meeting, Ours drafted a response to the newspaper, which accused Johnson of being political and stated that the GCPD was fine.

335. Johnson did not recuse her or her DA's office from the upcoming 2020 indictments against Powell and Scott.

336. Instead, on November 15, 2019, Johnson hired a "special assistant," retired Clayton County District Attorney Tracy Graham-Lawson, whom Johnson had known for years, to review the case.

337. Johnson claimed to the public that Graham-Lawson's prosecution and indictments against Powell and Scott were achieved through an independent outsider's review of facts and law, but knew those claims were not true.

338. Johnson admitted that she had tasked Daras in helping Graham-Lawson with the

actual process, including the indictments.

339.   During the fall of 2019, Powell directed Captain Jump to investigate an assault involving Reid Zeh, a former ADA in the Brunswick Judicial Circuit, who was alleged to have assaulted his girlfriend, Whitney Johnson.

340.   The assault was captured on video, which Stewart had in her possession but took no action on.

341.   Captain Jump obtained the video from Stewart, with Stewart maintaining that the assault was not a domestic related case despite GCPD records proving differently.

342.   Captain Jump learned that another assault occurred months earlier, and Stewart was also in possession of video footage of that assault.

343.   Stewart had videos in her possession showing felony assaults perpetrated against a domestic violence victim but took no action to protect the victim.

344.   Stewart instructed Captain Jump to not obtain warrants for Zeh's arrest, however, he did so anyway for multiple felony offenses, which made Johnson livid.

345.   Also, in the fall of 2019, James "Jim" Turner (hereinafter "Turner"), a federal agent employed by the BATF, had a search warrant executed at his residence by agents with the Federal Bureau of Investigation.

346.   Although Turner was not employed by a local agency, he was directly involved in investigating a copious number of narcotics and drug related cases prosecuted in Glynn County Superior Court by members of the GCPD, BPD, and GCSO.

347.   Turner was charged federally with possession of heroin, resigned his position with the BATF, and in 2021 pled guilty in federal court to possession of heroin.

348.   Johnson was aware of Turner's arrest and subsequent plea, but did not notify

attorneys or the courts, as she had done in the Cassada case, that Turner had been arrested, because Turner had a close relationship with Johnson's office, and more specifically, Stewart.

349. Johnson had a duty to report this information to defense attorneys as potential impeaching information under *Brady v. Maryland* but failed to do so.

350. In November 2019, Scott had a telephone conversation with Jay Wiggins (hereinafter "Wiggins"), who at the time was the Glynn County Emergency Management Director.

351. Wiggins told Scott that Johnson was going to come after both Powell and Scott.

352. Wiggins went on to become the GCPD police chief after Powell's arrest and later expressed concerns that he himself could be indicted.

353. During a heated conversation between Captain Jump and Wiggins in the Fall of 2020 regarding the DA's office not assisting the GCPD with investigations, Captain Jump told Wiggins he needed to act like a police chief.

354. In response to Captain Jump's comment, Wiggins stated if he did he would be the next chief indicted.

355. Due to Jump's July 2019 call to Sheriff Kight along with Wiggins' warning, Scott reached out to Keith Higgins (hereinafter "Higgins"), then a private practice defense attorney, for representation should the need arise.

356. Higgins told Scott he had heard that Johnson was trying to "flip the Dustins" against him and Powell, referring to Simpson and Davis.

357. On January 11, 2020, Scott received a telephone call from Yarborough, who informed him he had heard about the upcoming indictments.

358. Yarborough relayed to Scott that Stewart had asked him to reach out to Scott.

359.   According to Yarborough, Stewart said to tell Scott that out of the four people total that they were seeking indictments against, Scott was on the lowest end of the totem pole, the bottom end of level of being important.

360.   Stewart later testified that she remembered a conversation with Yarborough, and that since Scott had not testified during the *Whittle* hearings, it would behoove him to come and speak to tell his side.

361.   Stewart stated Scott definitely could be a witness in the case rather than a defendant.

362.   In January 2020, just one month prior to the indictments, Johnson's DA office was still trying to flip Scott to scare him into providing false testimony against Powell.

363.   Despite threats of his indictment, Scott would not suborn perjury for Johnson.

364.   During January 2020, civil attorneys were working on filing a civil wrongful death lawsuit on behalf of Katie Sasser's estate.

365.   Emails show that one of the attorneys, Wrix McIlvaine, emailed a draft copy of the lawsuit to Johnson for her review.

366.   The final "filed copy" of the lawsuit was also emailed to Johnson on January 31, 2020.

367.   On February 3, 2020, DA's office employee Vickie Moore, at Johnson's direction, forwarded the lawsuit to Cabiness, the very judge who granted Sasser's bond, without requiring electronic monitoring of Sasser.

368.   The wrongful death lawsuit did not name Jump, Johnson, or any of the other political allies who worked hard to keep Sasser out of jail.

369.   The wrongful death lawsuit was only focused on GCPD members, including

Powell and Scott.

370.   The civil wrongful death lawsuit filed in January 2020 contained verbiage and allegations from the indictments Johnson would soon seek against Powell and Scott in February 2020.

371.   The civil wrongful death lawsuit was an indicator that either Johnson had assisted in drafting the lawsuit or she had leaked privileged information to the private attorneys to be used in their civil lawsuit.

372.   The civil wrongful death lawsuit was released to the media in an effort to smear Powell, Scott, and the GCPD and taint potential grand jurors within a month of Johnson's indictments against them.

373.   Concurrently, Georgia State Senator William Ligon and Georgia State Representative Don Hogan, both political allies of Jump and Johnson, were pushing legislation in both chambers to allow citizens of counties to vote on the abolishment of county police departments in Georgia and turn their law enforcement responsibilities and assets over to the county sheriff.

374.   Although the proposed legislation was state law, a legislator from Rome, GA was quoted in a news article that the bill was specifically aimed at Glynn County and had a sunset date of January 2021.

375.   The other Georgia State Representative who represented Glynn County, Jeff Jones, would not get on board with Jump and Johnson's power grab attempt.

376.   Several weeks prior to Johnson's February 2020 indictments, Jump had a revealing conversation with Powell, where Jump informed Powell that he, not Powell, should be in charge of all narcotics enforcement in Glynn County.

377. Powell's response to Jump was that the Glynn County Board of Commissioners was in charge of that decision, not him.

378. Less than a week prior to Powell and Scott being indicted, on Sunday, February 23, 2020, Ahmaud Arbery, a young black male, was shot and killed while jogging in a Glynn County neighborhood.

379. The GCPD responded to the incident and began an investigation.

380. Powell only worked a half-day on Monday, February 24, and has not worked at GCPD since due to Johnson's seeking indictments the same week.

381. Arrests were not made for the murder of Ahmaud Arbery for several weeks.

382. Despite Wiggins, not Powell, leading the GCPD after Ahmaud Arbery's murder, Johnson and Jump capitalized on the perceived botching of the investigation, placing the blame solely on Powell's leadership.

383. Jump and Johnson further worked in concert with political allies to smear the GCPD and Powell, knowing he was not responsible for the lack of arrest, and rallied activists to publicly call for Powell's ousting.

384. On February 28, 2020, Powell and Scott were indicted for alleged "oath of office" violations, as well as charges related to influencing a witness and attempt to commit a felony.

385. Captain Jump had a conversation with Daras the morning of Wednesday, February 26, 2020, just minutes before the GJ was to hear evidence presented by Daras and Johnson's office against Powell and Scott.

386. Captain Jump had been subpoenaed as a witness in the GJ proceedings, however, once he arrived at the courthouse, he was told he was no longer needed by Tracy Graham-Lawson.

47

387. After Captain Jump expressed his disdain with the GJ proceedings and told Tracy Graham-Lawson he wanted to talk with someone, she referred him to Daras.

388. Captain Jump expressed to Daras his confusion about what was transpiring with the indictments being sought against Powell, Scott, and others, and that he did not support the indictments.

389. Daras indicated the same, with Daras saying that he and Captain Jump were not that far off in their beliefs.

390. Despite Daras' statement suggesting that he did not agree with the indictments being sought, he went ahead with the plan to seek an indictment against Powell and Scott.

391. Following the indictments, Powell and Scott were booked and processed at the County Jail, were required to post bond, and were held over for trial pursuant to the indictments for a period of more than four (4) years.

392. On May 21, 2020, Johnson officially recused herself and her DA's office from the charges she brought against Powell and Scott based upon a conflict of interest.

393. On June 15, 2020, via administrative order, the Georgia Attorney General appointed as a special prosecutor, South Georgia Judicial Circuit District Attorney (hereinafter "SGDA") Joe Mulholland (hereinafter "Mulholland"), to the case.

394. In September 2020, Judge Anthony Harrison granted Special Demurrers and dismissed all of the oath of office violations originally brought by Johnson against Powell and Scott.

395. In late 2020 or early 2021, Mulholland reached out to Pete Skandalakis (hereinafter "Skandalakis"), director of the Prosecuting Attorney's Council of Georgia, for guidance on how to handle the oath of office accusations against Powell and Scott.

396. The highly respected Director, Skandalakis, specifically counseled Mulholland not to seek reindictment on the oath of office violations against Powell and Scott.

397. Skandalakis strongly cautioned Mulholland that he was opening a Pandora's box.

398. During a 2021 Summer DA's Conference, Skandalakis and Mulholland got into a heated discussion on Jekyll Island because Mulholland, who had previously sought legal direction from Skandalakis, was ignoring and refusing to follow Skandalakis' legal advice, charging forward with the baseless oath of office reindictments against Powell and Scott.

399. In the summer of 2021, a unified command (hereinafter "UC") was established to prepare for and manage the high-profile Ahmaud Arbery murder trial.

400. The UC was composed of high-level leaders from numerous local and state public safety agencies, as well as federal assets.

401. At the conclusion of the operation, dubbed "Operation Golden Horizon", as noted by Planning Section Chief Lori Stanley-Chase on December 15, 2021, a Memorandum for Record (hereinafter "MFR") was approved, written, signed by all participants, and submitted for electronic filing by the UC Incident Commanders.

402. The purpose of the MFR was to document attempts by Jump "to disrupt, deter, hamper, obstruct, usurp, and dissolve the Unified Command."

403. According to the MFR, on multiple occasions, Jump and his newly appointed Undersheriff (Chief Deputy) Mario Morales (hereinafter "Morales") made knowingly false statements about the activities being conducted by the UC to both elected and appointed officials within Glynn County and the City of Brunswick in order to sway decisions to GCSO's favor through deception.

404. According to the MFR, the results of Jump and Morales' actions hindered the

49

ability of the UC to perform its required activities under its delegation of authority.

405.    The UC, an independent body of public safety officials, described the motive for Jump's constant interference with the UC as Jump's attempt to show the public he should be in charge of all law enforcement in Glynn County.

406.    The MFR memorialized that Jump's behavior was in line with his prior attempted power grab of the GCPD, along with that of his political allies, including Johnson and Georgia State Senator Willam Ligon, to transfer police power from the GCPD to the GCSO.

407.    The Unified Command's MFR further enumerated a November 29, 2021, approximately 25-minute interaction between Morales and UC Communications Unit Leader Edwin Whitworth.

408.    Morales, who was working for Jump in 2021, had previously worked for Jessup at the McIntosh Sheriff's Office.

409.    Morales was also a close friend of Danny Lowe.

410.    According to the MFR, Morales told UC's Whitworth, while referring to the current Brunswick Judicial Circuit District Attorney Keith Higgins, who unseated Johnson in 2020, that, "the DA is bad news", "people are looking into" the DA's office, and the Brunswick DA's office will be investigated.

411.    The Glynn County political machine is currently targeting Higgins, whose office is under investigation.

412.    Identical to the repeated attacks to remove Powell and Scott from their top GCPD positions as far back as 2018, in November 2021, Morales was aware of a conspiracy to remove the newly elected District Attorney of the Brunswick Judicial Circuit, Higgins.

413.    The MFR cited November 2021 statements made by Morales to UC Whitworth

about the former DA, Johnson, that, "Jackie will be back in office soon" and "doing what she needs to do".

414. The MFR detailed 2021 conversations by Morales attacking the new GCPD Police Chief, Jacques Baptiste (hereinafter "Baptiste").

415. Baptiste, the first black police chief of Glynn County, GA, was hired June 2021 and was officially sworn in on December 7, 2021.

416. During that same November 29, 2021, conversation, the MFR noted that Morales was enraged that the Glynn County Commissioners had hired Baptiste, stating it was "unprecedented that the county would choose an outsider" over him.

417. In an interaction on July 30, 2021, the MFR also memorialized a conversation between UC's Chief Goodrich and a Mr. Faulkner with Morales, where Morales stated he was still trying to get a handle on how things worked at GCSO and was not sure where he fit in the line of command yet, as he was reporting to Sheriff Jump and Major Jump, Neal Jump's son, who was below him in rank, at the same time.

418. According to the MFR, Morales explained to UC's Goodrich and Faulkner that Jump was "my king" several times and stated, "I do what my king tells me."

419. Shocked at this depiction of Jump as Morales' king, UC's Faulkner responded that as an elected official, Jump and everyone under him at the GCSO, based on their oath of office, had pledged their loyalty to the citizens of Glynn County.

420. The MFR also referenced that during the November 29, 2021, conversation, Morales informed UC's Whitworth that combining the GCPD with the GCSO would "be on the ballot" and that the "commissioners were pushing to make that happen".

421. The MFR also specifically listed that Morales stated that the issue of

51

consolidation would be a recurring cycle until GCSO had all law enforcement in Glynn County.

422. Morales claimed that there would be many "special prosecutors" assigned to go after all the people who were standing against the Sheriff, Neal Jump.

423. The facts detailed in the December 15, 2021, MFR, prepared by numerous public safety officials from various agencies, provide a disturbing snapshot of law enforcement influence at the GCSO in Glynn County, GA in 2021 under the leadership of Jump.

424. By December 2022, just one year after he was sworn in, Baptiste resigned his position as the GCPD police chief after having dealt with constant interference from Jump and blowback from making appropriate reforms at the GCPD.

425. Baptiste contacted Powell and informed him that, as the GCPD Police Chief, he had independently investigated the charges brought against Powell, and found Powell had been set up and had been railroaded.

426. In August 2021, Mulholland sought reindictments against Powell and Scott, largely based on Jump and his allies and surrogates making knowingly false claims with fabricated timelines.

427. On August 20, 2021, a Glynn County GJ returned indictments against Powell (Counts 1 through 4) and Scott (Count 1) for alleged violations of their oaths of office by purportedly violating *Brady v. Maryland*, 373 U.S. 83 (1963), through failing to conduct internal investigations and administrative actions of police personnel.

428. During the August 20, 2021, GJ, Lawson refused to testify before the GJ.

429. The jurors were misled into believing that Lawson was unavailable to appear before the GJ, despite the fact that records show Lawson was working on August 20, 2021, and was assigned to civil process in the City of Brunswick.

430. Because of Lawson's refusal to testify, Daras had to read the transcript of Lawson's previous testimony to the jurors.

431. Despite Johnson's DA's office having recused itself on May 21, 2020, in a Georgia newspaper hit piece dated December 19, 2022, by reporter Jake Shore, Daras abdicated his proper role at the DA's office and smeared Powell and the GCPD in the media.

432. Daras was quoted in the article as stating, "There was a cowboy culture" at GBNET.

433. The newspaper article further noted that according to Daras, "It was a culture of secrecy, a culture of no one can know anything. The GBNET reports were locked, no one was allowed to access them."

434. According to Shore's December 2022 press article, Daras stated that, at the GCPD, Powell set the mood and referenced the February incident [Katelyn Jones car crash], noting it "was like, 'you're good to go, keep going boys,' according to Daras."

435. Daras, like many of the involved parties and/or their family members, e.g., former Camden Sheriff Jim Proctor, former GCPD Captain Kenny Ellis, former BPD officer Meredith Tolley and former DA employee Judy Lowe (Danny's Lowe's wife), went on to work for Jump at the GSCO after Johnson was unseated in 2020.

436.  On April 30, 2024, the Georgia Supreme Court ruled unanimously in a 9-0 opinion in Powell and Scott's favor, reversing the trial court's denial of their demurrers, thereby exposing blatantly improper prosecutorial overreach.

437. The Georgia Supreme Court held that the indictments were legally baseless, factually insufficient, and demonstrated Powell and Scott's innocence in *Powell v. State*, 318 Ga. 875 (2024).

53

438.   The Court found that, in the "oath of office" counts in Powell and Scott's case, "the details provided in each count actually negate the elements of the crimes charged." *Id.* at 882.

439.   The Georgia Supreme Court ruled that the additional facts alleged, viz., that Powell and Scott violated their oaths of office by committing *Brady* violations, "are inconsistent with the criminal statute as pleaded and negate the manner in which Powell and Scott purportedly violated the terms of their oaths of office." *Id.*

440.   The Georgia Supreme Court held that the indictments were so deficient that they did not even state an offense, noting that even if Powell and Scott admitted to the facts in the indictment, "they are still innocent of the alleged crimes because it is legally impossible to commit the crimes in the way the State alleged in the indictment." *Id.*

441.   On June 25, 2024, Brunswick Judicial Circuit Superior Court Judge Anthony Harrison granted special prosecutor Mulholland's Motion to *Nolle Prosequi* the remaining two counts against Powell and Scott, thereby ending the four-year DA prosecutions.

442.   Abuse of prosecutorial overreach resulted in the passage of GA HB 582, which is designed to eliminate politically motivated prosecutions on oath of office grounds.

443.   The bill, which went into effect on July 1, 2025, amends Georgia law to establish uniform oaths for peace officers and limits prosecution for oath violations to only those predicated on felonies or high and aggravated misdemeanors, effectively narrowing the scope of potential legal action against public officers.

444.   This bill was lobbied by the Georgia State FOP Lodge, in part, because of the actions taken against Powell and Scott by Johnson and Mulholland.

445.   The results of the Jump/Johnson conspiracy to the law enforcement careers of

54

Powell and Scott were devastating.

446.  Immediately after the DA's indictment against Powell in February 2020, Ours placed Powell on paid administrative leave.

447.  In February 2020, Overstreet placed Scott on paid administrative leave, with Scott later being reassigned as Police Commissioner, but on a temporary contract basis with a substantial decrease in pay.

448.  In September 2020, Ours notified Powell that he was being removed as the GCPD Police Chief but would remain a Glynn County employee with full pay and benefits.

449.  After that, Ours and various county commissioners called Powell several times seeking his resignation.

450.  When Powell declined to resign, Ours informed Powell he would terminate him.

451.  In January 2021, after Powell refused several contract buyout attempts, Ours terminated Powell.

452.  Powell was terminated without legal due process or Powell being afforded his right to appeal his termination, a process that would have included legal discovery.

453.  Glynn County's justification for Powell's termination was illegal.

454.  In August 2021, after Mulholland sought superseding indictments against Powell and Scott, Overstreet terminated Scott's employment with the City of Vidalia.

455.  Due to the two fraudulent indictments and media smear campaigns spearheaded by Johnson, Jump and Mulholland, both Powell and Scott have been repeatedly denied employment opportunities, or had offers of employment given and then withdrawn, in their chosen leadership roles in law enforcement.

456.  Despite Powell's continued attempts to obtain full employment, after constantly

reaching final interviews, high-level law enforcement roles were offered to other candidates, not Powell.

457. With today's internet climate, with hundreds of easily available, negative press articles attacking Powell and Scott's integrity and character littered across the internet, as a direct result of the Johnson/Jump conspiracy, Powell and Scott lost employment opportunities and higher paying positions.

458. The fact that both Powell and Scott were fully exonerated by the Georgia Supreme Court does not change that they have been forever branded as unprincipled and lawless police commanders.

459. In October 2025, after the Chief of Police of Flowery Branch, GA did his own internal review of the indictment charges and determined Powell had been railroaded in Glynn County, Powell finally received an offer of employment as the Deputy Chief of Police for the City of Flowery Branch, GA.

460. Immediately after his hiring became public, Powell, his wife and children, had to endure and re-live weeks of malicious and negative press stories with the same stale, baseless charges from the Jump/Johnson conspirators being published and rebroadcast by the media, despite every single charge against Powell having been dispositively dismissed, nor a single allegation ever proven in a court of law.

461. In November 2025, a local Mississippi reporter employed by the *DeSoto Times-Tribune*, Mark Randall (hereinafter "Randall"), called and later emailed the Flowery Branch, GA Chief of Police, and repeatedly defamed and smeared Powell, in an attempt to get Powell fired from his new position.

462. After Flowery Branch, GA Chief of Police informed Randall that he had fully

vetted Powell and found the Glynn County indictments/charges unfounded, on November 21, 2025, Randall sent an email addressed to the Flowery Branch Mayor, where Randall, with no evidence, accused Powell, in writing, of previously fixing a traffic ticket for a city employee, thereby accusing Powell of a crime, and then began attacking Powell's character.

463.    Randall made numerous false and defamatory statements to the Flowery Branch Mayor, including, "I was a reporter who covered the police beat in Dothan [AL] for two years, John R. Powell is the most CORRUPT official I have ever covered. . . . Mark my words, he will be a cancer on your city and your police department. He is an unethical man, a thoroughly corrupt man, and I am shocked that you would let your police chief hire this man.  He leaves a trail of slime everywhere he goes."

464.    When the forwarded defamatory email was discussed with the editor of the *DeSoto Times-Tribune*, its editor immediately apologized and seemed completely perplexed that one of their Mississippi reporters, Randall, would send out an email using his press credentials/title under their media banner, explaining that the *DeSoto Times-Tribune* was a local Mississippi paper, whose coverage was solely limited to Mississippi, and the paper did not report on out-of-state matters.

465.    In August 2021, during Mulholland's cross-examination of Powell before the second GJ, Mulholland veered away from testimony relevant to the indictments and raised an odd line of questions when he asked Powell if Powell knew an attorney named Banks Smith (hereinafter "Smith").

466.    Before Powell could respond, Mulholland remarked that Smith now works for him at his SGDA's office.

467.    Mulholland then proceeded to accuse Powell, during Powell's time as the Dothan

Police Chief, of retaliating against his Dothan, AL employees.

468. When Mulholland asked Powell whether he had ever reassigned any employees who had disagreements with him, before Powell could answer, Mulholland added, "So it's a small world."

469. When Powell responded, "Yes Sir," Mulholland smirked and boasted, "Banks Smith now works for me."

470. Mulholland's August 2021 GJ statements indicated that Smith, an attorney working at Mulholland's SGDA's office, had some kind of personal grudge against Powell, from Powell's time in 2005-2009 as the Dothan, AL police chief.

471. When Mulholland continued to ask questions about the issue of re-assignment of employees in Dothan, AL, Powell asked the name of the Dothan employee Mulholland was referring to, so he could properly respond.

472. After Mullholland refused to identify a specific Dothan employee, Powell responded generically that employees had been re-assigned, based on either their job performance or recommendations from a supervisor.

473. Based on Powell's response, Mulholland dropped this line of questioning at the second GJ.

474. Smith, a former Dothan Attorney, Powell, a former Dothan Chief of Police, and Randall, a former police-beat reporter at the local *Dothan Eagle* newspaper, all worked in Dothan, AL in 2005-2006.

475. At that time, Smith, while working as a defense attorney, represented a Dothan Police Lieutenant named DeWayne Herring (hereinafter "Herring"), who lived in the small town of Bainbridge, GA.

58

476.   Bainbridge, GA, is the location where Mulholland works and his SGDA office is located.

477.   Herring was likely the Dothan "employee who was reassigned" that Mulholland was alluding to in his cross-examination of Powell at the second GJ, when Mulholland kept referencing Herring's former defense attorney Smith.

478.   In 2005-2006, after Powell had Herring reassigned from the Narcotics Division to Crime Statistics, a duty transfer where Herring did not lose any pay, benefits, or rank, etc., Herring, who did not like the transfer, had his defense attorney Smith file a police board appeal of his reassignment.

479.   During that appeal, Smith argued that Powell, as the Dothan, AL Police Chief, had no right to transfer his employee, Herring, to a different position within the police department.

480.   After Smith lost Herring's initial claim at the police board, Smith filed an appeal to the Circuit Court, based on the same theory, which was summarily dismissed.

481.   At the time, Randall, a reporter who covered the police beat for the local newspaper, the *Dothan Eagle*, wrote an article against the Dothan PD and in favor of Herring and Smith's position.

482.   After repeated negative articles written by Randall in the *Dothan Eagle*, which contained easily-proven, untrue statements and stories, Dothan Mayor, Pat Thomas, filed a complaint with the Editorial Board of the *Dothan Eagle*, cataloging Randall's inaccurate and misleading press reports.

483.   Based on the Dothan Mayor's complaint, Randall was let go from the *Dothan Eagle* after only two years.

484.   Randall acted in concert with Mulholland, Smith, Jump, and Johnson in an attempt to have Powell fired from his new employment position in Flowery Branch.

485.   In January 2026, the Probable Cause Committee ("PCC") of the Georgia Peace Officer Standards and Training ("POST") Council, which is composed of law enforcement leaders from across the State, as well as at least one representative from the Georgia Attorney General's Office, met and reviewed the POST investigation against Powell and Scott.

486.   Because POST investigations and recommended sanctions are administrative in nature, the burden of proof is only by a preponderance of the evidence, as opposed to the much-higher reasonable doubt standard applied in criminal cases.

487.   After the PCC's review, which assessed only evidence from the district attorney's office without any rebuttal evidence presented by Powell or Scott, the PCC determined that no action be taken against Powell and Scott's peace officer certifications.

488.   On March 4, 2026, the full POST Council met and voted to accept the PCC's recommendation not to take any action against Powell and Scott.

## COUNT I
### 42 U.S.C. §1983 – Malicious Prosecution

489.   Plaintiffs repeat and re-allege all of the paragraphs in this Complaint as if fully set forth herein.

490.   Defendants EMMETT NEAL JUMP, JAQUELYN LEE JOHNSON, JAMES C. PROCTOR, STEPHEN D. JESSUP, JORDAN DANIEL LOWE, JR., MICHAEL W. LAWSON, WILLIAM V. DARAS, LIBERTY STEWART a/k/a LIBERTY GENDRON, JOHN DUSTIN SIMPSON, ELZAVER DUSTIN DAVIS, JOSEPH MULHOLLAND, and BANKS THOMAS SMITH caused Plaintiffs to be improperly subjected to judicial proceedings for which there was

60

no probable cause.  These judicial proceedings were instituted and continued with malice and resulted in the injury to Plaintiffs.  All such proceedings were ultimately terminated in Plaintiffs' favor and in a manner indicative of innocence.

491.    The legal process justifying Plaintiffs' seizure was constitutionally infirm and their seizure would not otherwise be justified without legal process.

492.    For example, the Defendants accused Plaintiffs, *inter alia*, of "oath of office" violations alleging violations of *Brady v. Maryland*, 373 U.S. 83 (1963), for the failure to conduct investigations of other police officers, knowing that such charges were baseless and that Plaintiffs were innocent because it was legally impossible to commit such crimes in the way the State alleged in the indictments. The Defendants fabricated evidence, suborned perjury, manipulated witness testimony, and withheld exculpatory evidence. The witnesses knowingly made false statements to prosecutors with the intent of exerting influence to institute and continue judicial proceedings against Plaintiffs.

493.    The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiffs' rights.

494.    As a direct and proximate result of this misconduct, Plaintiffs suffered injuries, including, but not limited to, the deprivation of liberty, being booked in the county jail, having to post bond, being held over for trial for more than four years pursuant to the baseless indictments, great mental anguish, humiliation, degradation, emotional pain and suffering, loss of employment, extensive attorney's fees, and other grievous and continuing injuries and damages, as is more fully alleged above.

<div align="center">

**COUNT II**
**42 U.S.C. § 1983 – Conspiracy**

</div>

495.    Plaintiffs repeat and re-allege all of the paragraphs in this Complaint as if fully

set forth herein.

496.    All of the Defendants reached an understanding amongst themselves to frame the Plaintiffs for crimes they did not commit, to deprive them of their liberty, to seize them without probable cause, and to prevent them from lawful employment in furtherance of their agreement to eliminate the Glynn County Police Department, which Plaintiff POWELL headed and Plaintiff SCOTT previously held a command role, and to permanently transfer control over law enforcement, including narcotics enforcement, to the Glynn County Sheriff's Office.

497.    In furtherance thereof, the Defendants deprived the Plaintiffs of their liberty, caused them to be arrested without probable cause, post bond, and held over for trial pursuant to the baseless indictments, all in violation of Plaintiffs' constitutional rights, as described above.

498.    In this manner, the Defendants conspired to accomplish an unlawful purpose by unlawful means.

499.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

500.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiffs' constitutional rights.

501.    As a direct and proximate result of this illicit agreement referenced above, Plaintiffs suffered injuries, including but not limited to the deprivation of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, loss of employment, extensive attorney's fees, and other grievous and continuing injuries and damages.

**WHEREFORE**, Plaintiffs JOHN POWELL and BRIAN SCOTT pray this Court enter judgment in their favor and  against Defendants EMMETT "NEAL" JUMP, JACQUELYN LEE

JOHNSON, JAMES C. PROCTOR, STEPHEN D. JESSUP, JORDAN DANIEL LOWE, JR., MICHAEL W. LAWSON, WILLIAM V. DARAS, LIBERTY A. STEWART a/k/a LIBERTY A. GENDRON, JOHN DUSTIN SIMPSON, ELZAVER DUSTIN DAVIS, JOSEPH MULHOLLAND, BANKS THOMAS SMITH, and MARK RANDALL, awarding compensatory damages, punitive damages, costs and attorneys' fees against all Defendants, and for such further and additional relief as this Court may deem appropriate and just.

## JURY DEMAND

Plaintiffs demand trial by jury.

Respectfully submitted this 22nd day of June, 2026.

<div style="margin-left: 40%;">

**/s/ Joseph J. Steffen, Jr.**
Joseph J. Steffen, Jr.
Georgia Bar No.: 677766
Law Office of Joseph J. Steffen Jr.
223 W. York Street
Savannah, GA 31401
912-999-8444
joe@joesteffen.com
*Attorney for Plaintiffs*

***/s/ Anthony L. Jaime***
Anthony L. Jaime
Georgia Bar No.: 505393
Law Offices of Joseph J. Steffen, Jr.
223 W. York Street
Savannah, Georgia 31401
912-999-8444
anthony@joesteffen.com
*Attorney for Plaintiffs*

**/s/ Steven W. Becker**
Steven W. Becker
Law Office of Steven W. Becker LLC

</div>

63

205 N. Michigan Avenue, Suite 810
Chicago, IL 60601
(312) 396-4116
swbeckerlaw@gmail.com
[*Pro hac vice* applicant]
*Attorney for Plaintiffs*